# Patterson *v.* Milligan.

### *Automobile Accident.*

(Decided November 10, 1914.    Rehearing denied December 14, 1915. 66 South. 914.)

1. *Automobile; Collision; Burden of Proof.*—Where the action is for being run down by an automobile, plaintiff has the burden of showing that his injuries were the result of the negligence of the operator and that such person was the agent or servant of defendant, acting within the line and scope of his employment.

[Patterson v. Milligan.]

2. *Same; Ownership.*—Proof that the motor-car bore the same license number as that issued to defendant under Acts 1911, p. 636. raises a presumption that the car belonged to defendant; but this presumption may be rebutted.

3. *Same; Evidence.*—The evidence examined and held not to sustain a verdict that the machine which ran down the plaintiff belonged to defendant.

4. *Same; Evidence; Hearsay.*—Where the driver of the automobile testified that he was not the agent or servant of defendant, his statement out of court to the contrary was not admissible to show that the machine belonged to defendant, although admissible in contradiction of the witness.

5. *Property; Presumption.*—The presumption that ownership of property continues where once shown to exist, may be rebutted.

(Brown, J., dissents.)

APPEAL from Jefferson Circuit Court.

Heard before Hon. C. B. SMITH.

Action by Tom Milligan against W. G. Patterson for injuries suffered in an automobile accident. Judgment for plaintiff and defendant appeals. Reversed and remanded.

DAVID S. ANDERSON, and BENJAMIN F. RAY, for appellant. Negligence of a plaintiff which proximately contributes to his injury bars his right of recovery.—*Ala. S. & W. Co. v. Tallant,* 165 Ala. 521; 29 Cyc. 507; *So. Ry. v. Morgan,* 54 South. 626. The court erred in refusing the affirmative charge as to the first count.—*L. & N. v. Smith,* 163 Ala. 141; *Anniston E. & G. Co. v. Rosen,* 159 Ala. 195; *Mobile L. & Ry. Co. v. Baker,* 158 Ala. 491; *Jones v. Ala. Min.,* 18 South. 20. On the same authorities, the court erred in refusing the affirmative charge as to count 2. The court erred in refusing to grant plaintiff a new trial.—*So. Ry. v. Morgan, supra; Teague v. Bass,* 131 Ala. 422; *L. & N. v. Lee,* 97 Ala. 327. The court erred in overruling demurrers to the original count of the complaint.—*McCrary v. A. G. S.,* 62 South. 18; *So. Ry. v. Hanby,* 62 South. 871; *Seaboard M. Co. v. Woodson,* 10 South. 87.

W. A. DENSON, for appellee. The car bore the number 509, and that was the number given Patterson under the license Act of 1911, p. 636. This raises a prima facie presumption that the car belonged to Patterson and that he was responsible for the act of the person in charge of it. Counsell discusses other assignments of error, but without citation of authority.

THOMAS, J.—The plaintiff, appellee here, while riding on his bicycle along or across a street in the city of Birmingham, was injured by a passing automobile. The complaint avers, among other things, that plaintiff's "said injuries and damage were proximately caused by the negligence of the defendant's servants or agents while acting within the line and scope of their employment" in the operation of said automobile. At the conclusion of the evidence, the defendant requested the general affirmative charge, which was refused, and, after verdict and judgment against him, made a motion for a new trial, which was overruled. The action of the court in each of these particulars is assigned as error.

The burden of proof was on the plaintiff, in order to make out his case, to show, not only that his injury was the proximate result of the negligence of the person operating the automobile, but also, as was alleged, that such person was the servant or agent of the defendant, and was, at the time of such negligence, acting within the line and scope of his employment.

The only evidence offered by the plaintiff tending to establish the latter fact was, first, the registration record, required by section 5 of the act approved April 22, 1911 (Gen. Acts 1911, 636), to be kept in the probate office, which record showed that, in compliance with the provisions of the act mentioned, the defendant had on November 7, 1912, registered with the Secretary of State as

belonging to him (defendant) one Oldsmobile of 25 horse power, etc., and that the Secretary of State had assigned to this car number 509 as its registration number, and had issued to defendant a certificate of registration or tag accordingly; and, second, the testimony of plaintiff's witnesses to the effect that the accident or collision in which plaintiff was injured occurred about the 1st of December, 1912 (after, as seen, said registration in November previous), and that the automobile which injured plaintiff bore the tag number 509 and a printed sign "for hire." This was the only description plaintiff's witnesses gave of the automobile which ran against plaintiff. The fact that it bore the tag number 509 was, in the light of the record mentioned, presumptive evidence that it was the Oldsmobile that had been so previously registered under that number (509) as the property of the defendant, and that it was still his property —the records showing no transfer—and that the person in charge of and operating it was his servant or agent.—Gen. Acts 1911, 634; 22 Am. & Eng. Ency. Law (2d Ed.) 1242.

These presumptions, however, while sufficient to make out a prima facie case as to the point under consideration, were yet, of course, rebuttable ones (22 Am. & Eng. Ency. Law, supra); and we are of opinion that the evidence for the defendant overwhelmingly rebutted them and showed, not only that the car which struck plaintiff was not an Oldsmobile, though it did bear, as testified to by plaintiff's witnesses, the tag number 509, but also that the car which did strike him was not defendant's property, and that the person in charge of and operating it was not his servant or agent, and that defendant was not in the car and had nothing to do with its ownership, management, possession, or control at the time, and knew nothing of the accident or of the fact that the car

bore the same number (509) as his Oldsmobile until afterwards, when the plaintiff called on him for damages, informing him that he (plaintiff) had been injured by car No. 509. The defendant thereupon denied all liability, and stated that it could not have been his car. The plaintiff then and there examined defendant's car, which was in front of the latter's store, and which was an Oldsmobile, practically new, bearing the tag 509, and stated, according to defendant's testimony, that it was not the car that ran against him, and, according to plaintiff's own testimony, that defendant's car looked "newer, brighter, and cleaner" than the one that ran against him. Outside of this, plaintiff added that he observed no distinguishing feature between the two cars, except that the car which struck him had a "for-hire" tag on it, while defendant's did not. Defendant's evidence showed that defendant's said car had never been run for hire and had never had any such tag as "for hire" on it, and that he bought the car brand new in September, 1912, shortly before he registered it. The chauffeur, who was admittedly running the car that struck plaintiff, and the assistant, who was admittedly the only person with him at the time, both testified that the car which struck plaintiff was a Stevens-Duryea—a second-hand car—that belonged to one Douthit, which was at the time of the accident, and for some time prior thereto being run for hire by the chauffeur under an agreement with Douthit to divide the profits, and that this car at the time of the accident had a "for-hire" tag on it, as well as a tag bearing the number 509. All the other facts and circumstances in evidence tended to bear out and support this testimony with nothing to conflict with it, save the presumption mentioned.

The way in which it came about that the Stevens-Duryea car bore the tag number 509 was, according to the

undisputed evidence, as follows: Neither Douthit, the owner of it, nor the chauffeur, who was operating it for him under the agreement as stated, had at the time of the accident, which was about December 1, 1912, as said, paid the registration or license tax on the car for the new year commencing in October, 1912; and the chauffeur, fearing arrest if caught by the authorities running the car without a new tag—a tag for that year—applied, some time before the accident, to defendant's chauffeur, with whom he was on intimate terms, to loan him, until he or Douthit could pay the tax and get his tag for that year, the duplicate of the tag 509, which had, in compliance with the terms of the act cited, been issued to defendant by the Secretary of State at the time of the issuance to defendant of the original tag 509. Defendant's chauffeur, without defendant's consent or knowledge, as was undisputed, complied with this request, and, as was also undisputed, this duplicate tag 509 was placed on the Stevens-Duryea car, while the original remained on defendant's Oldsmobile, which, at the time of the accident, was in the garage of Hughes & Nixon to have some of its valves ground, as the defendant's evidence showed. There was no evidence for the plaintiff or otherwise, either direct or inferential, to conflict, as stated, with this evidence for defendant, except the bare presumption to which we have heretofore adverted, unless possibly it be the testimony of plaintiff himself on this point, to which we have alluded, and which we have set out in substance and which—every word of it—may be true, we think, entirely consistent with defendant's evidence.

Whether or not the mentioned opposing presumption was or is such in character as to have forbidden the court from giving the general affirmative charge for defendant, which was requested and refused (as bearing on which point, see, however, *Roman v. Lentz,* 177 Ala.

71, 58 South. 438; *L. & N. R. R. Co. v. Marbury,* 125 Ala. 254, 28 South. 438, 50 L. R. A. 620; *A. G. S. R. R. Co. v. Moody,* 90 Ala. 46, 8 South. 57; *Wynn v. State,* 65 South. 687; and 22 Am. & Eng. Ency. Law, 1235, 1236), is a question we need not and do not consider, since the judgment must be reversed and a new trial had anyway on account of the overruling by the court of defendant's motion for a new trial, and since, on another trial, the evidence may be different. The great weight, to say the least, of the evidence on this trial was, as seen, certainly opposed to any theory that the car which struck plaintiff was defendant's Oldsmobile, and the preponderance is so decided as to clearly convince us that the verdict is wrong, and ought not to be permitted to stand.—*Cobb v. Malone,* 92 Ala. 630, 632, 9 South. 738; *So. Ry. Co. v. Morgan,* 171 Ala. 294, 54 South. 626; *C. Ry. Co. of Ga. v. Letcher,* 69 Ala. 106, 44 Am. Rep. 505; *White v. Blair,* 95 Ala. 147, 10 South. 257; *Teague v. Bass,* 131 Ala. 422, 31 South. 4; *Cox v. Birmingham,* 163 Ala. 170, 50 South. 975; *L. & N. R. R. Co. v. Lee,* 97 Ala. 325, 12 South. 48; *Birmingham Rolling Mill v. Rockhold,* 143 Ala. 115, 42 South. 100; *Birmingham Ry. Co. v. Clay,* 108 Ala. 233, 19 South. 309; *Birmingham Ry. Co. v. Owens,* 135 Ala. 154, 63 South. 8. There was no other theory supported by any evidence at all upon which defendant could have been held liable.

It is true that the defendant stated on the stand that he at one time owned the Stevens-Duryea car mentioned, but it is also true that the evidence showed without conflict that long before the accident he had sold it to said Douthit, to wit, in September, 1912, and ceased then to have any management, possession, or control over it, or any interest in it, except a lien securing the notes then given by Douthit for the balance of the unpaid purchase

money, which notes and lien defendant, on the day of the sale, transferred and assigned to the Highland Garage as security for the balance of the purchase money for the Oldsmobile mentioned, which he on that day bought, new, from them. These facts were testified to by the defendant, by Douthit, and by Whitehead, the representative of the Highland Garage, who negotiated and conducted the sale of the Oldsmobile. None of this testimony was in any way, either directly or inferentially, denied. It was also shown by the testimony of the defendant, by that of Douthit, by that of defendant's chauffeur, and by that of the chauffeur, who was operating the Stevens-Duryea car at the time it struck plaintiff, that the latter chauffeur had never at any time, either then, before, or since, been in the employ or acted as the agent of defendant, but at such time had been and was employed by Douthit, and Douthit only, to operate the car, which employment was given some time after Douthit had purchased the car from defendant in September before the accident in December. There is not a line in the record before us (and the bill of exceptions purports to set out all the evidence) to contradict any of this testimony, or either of these witnesses, except the testimony of plaintiff's witness Hawkins, who when called by plaintiff to testify in rebuttal, swore that he knew the said chauffeur (Charlie McConnell) who operated the Stevens-Duryea car mentioned, and that on one occasion, "a little before Christmas" (1912), when witness "was coming from home and was walking through a short cut," he met "Charlie about Twenty-Third and A. He," continued the witness, "had just made a trip over in that part of town, and I rode back to town with him. I knew Charlie and got in the car and rode back with him. I don't remember how we came to bring this subject up— just talking. He told me—I don't remember just exact-

ly how it came around, but I remember I was walking, but I remember he was running a car, and I asked him if he had bought the car, or something like that, and he told me he hadn't bought the car; that he was running it on halves. I knew the car; knew it when Mr. Patterson (defendant) first bought it. I remembered it, and asked if it wasn't the car Mr. Patterson had, and he said it was. He said he was running on halves with Mr. Patterson. He didn't state that he was running the car on halves with Mr. Douthit. I am positive of that."

Granting or assuming as true every word this witness for plaintiff swore, and that defendant's witness McConnell made the statement testified to out of court, which was contradictory to what he swore in court, the only effect and purpose of the proof of the making of such contradictory statement was merely to impeach the witness McConnell himself, with the view of destroying his testimony before the jury, and was not to afford and did not afford any affirmative evidence whatever against the defendant that the Stevens-Duryea car was his at the time of the accident, and that McConnell was then running it for him on halves. McConnell's unsworn statement, made outside of court, to the contrary—even if the jury believed he made such statement to plaintiff's said witness Hawkins—was purely hearsay evidence, so far as defendant was concerned, and was inadmissible, except for one purpose, and could not have been properly admitted, except for one purpose, and that was to discredit the testimony of McConnell. With McConnell's testimony eliminated entirely, there remained, as seen, the testimony of defendant, defendant's chauffeur, and Douthit, which was in no way impeached, to the effect that McConnell was not and never had been in the employ of defendant or acted as his agent, and that the Stevens-Duryea car was not the property of defendant at the time of the accident.

[Patterson v. Milligan.]

The only evidence for plaintiff, upon whom was the burden of proof, that tended in the least to establish the ownership in defendant of the Stevens-Duryea car at the time of the accident, and the consequent inference that the chauffeur who was then operating it was his agent or in his employ, was the presumption that title and ownership of property once shown to exist is presumed to continue (22 Am. & Eng. Ency. Law, 1242) ; but in this case the very witnesses—defendant's witnesses—by whom only it was shown that the title and ownership of the Stevens-Duryea car was once in defendant, testified, as pointed out, that such title and ownership had been parted with by defendant in September before the accident occurred in December. However considered, therefore, we are clear in the conclusion that the lower court should have granted defendant's motion for a new trial, and the judgment of said court is consequently reversed to the end that such new trial may be had.

Reversed and remanded.

BROWN, J. (dissenting).—The plaintiff (appellee here) brought this action to recover damages for injuries inflicted upon him as a result of being stricken by an automobile while he was riding along one of the public streets of the city of Birmingham on a bicycle. At the conclusion of the evidence, the court refused the affirmative charge requested by the defendant, submitted the case to the jury, and the issues were determined by the jury in favor of the plaintiff. After a return of the verdict, the defendant made motion for a new trial, which was overruled. These two rulings of the court present the only questions that were treated on the original consideration of the case; the court holding in effect that the defendant was entitled to the affirmative charge, and that the trial court committed reversible error in refusing the defendant's motion for a new trial.

The writer did not participate in the original consideration of the case, but on consideration thereof, on the application for rehearing, is not able to agree to the conclusions reached in the original opinion for reasons which are here set down.

By a general act approved April 22, 1911 (Gen. Acts 1911, pp. 634-650), the Legislature provided for the licensing of motor vehicles and imposed upon owners thereof certain duties with reference thereto as a prerequisite to their use on "public highways," and defined a public highway, as therein used, thus:

"The term 'public highway' shall include any highway, country road, state road, public street, avenue, alley, park, parkway or public place in any county, city, town or village except in a speedway, which may have been or may be expressly set apart by law for the exclusive use of horses and like carriages."

Some of the duties imposed by the act on owners of such vehicles, before they can be used upon public highways, are: That such owner must file in the office of the Secretary of State a verified application for registration of such vehicle, giving a brief description thereof, including the name of the manufacturer, the style, type, and factory number of such vehicle, the character of the motor power, the amount of motor power, and the insurable horse power, the name, residence, and business address of the owner, and the county in which he resides. Upon receipt of this application, it is made the duty of the Secretary of State to register such motor vehicle according to such dscription, and, upon the payment of the fees provided for by said act, to assign to such vehicle a "distinctive number" and issue to the owner a certificate of registration. It is also made the duty of the Secretary of State to furnish to the probate judges of the several counties a full and accurate list of motor vehicles regis-

tered from their respective counties, giving the "distinct-ive number" assigned to each motor vehicle, the name, residence, and business address of the owner. This list is filed by the probate judge and kept as a public record in his office, open to public inspection. Such registration is to be renewed annually on the 1st day of October of each year, upon the payment of the fees or tax provided for by this act. In case of a sale of such vehicle by the owner, it is made the duty of the purchaser, within ten days thereafter, to demand of the Secretary of State a certificate blank, and upon said blank such purchaser must furnish to the Secretary of State the name and business address of the previous owner, the number under which such motor vehicle is registered, and the name, business address, and residence of such purchaser; and upon receipt of this certificate or appli-cation it is the duty of the Scretary of State to note in the registered books or index such change of ownership, and to notify the probate judge of the county where the owner and purchaser reside of such sale and the name of the purchaser, which he shall note on the list of regis-terd vhicles received and kept by him on file in his office.

It is the duty of the owner registering such vehicle to procure, and of the Secretary of State to furnish, a num-ber plate 4½ inches wide and not more than 12 inches in length, in the upper left-hand corner of which shall be the word "Ala.," and to the right of which there shall be the "distinctive number" assigned to the vehicle set forth in numerals 3 inches long, each stroke of which shall be at least one-half inch in width, the plate to be of a dis-tinctive color or shade, showing marked contrast be-tween the number plate and that of the numerals and letters thereon, and each owner of a registered car is en-titled to two of these plates, which must be displayed on the vehicle, and no other number must be displayed on such vehicle.

[Patterson v. Milligan.]

Section 18 of the act provides:

"Every motor vehicle, operated or driven upon the public highways of this state shall be provided with adequate brakes in good working order and sufficient to control such vehicle at all times when the same is in use and a suitable and adequate bell, horn, or other device for signaling, and shall, during the period from one-half hour after sunset to one-half hour before sunrise display at least two lighted lamps on the front and one on the rear of such vehicle which shall also display a red light visible from the rear. The rays of such rear lamp shall shine upon the number plate carried on the rear of such vehicle in such manner as to render the numerals thereon visible at least fifty feet in the direction in which the motor vehicle is proceeding: Provided that the lamps on such vehicle need not be lighted when the vehicle is standing under the rays of a light and can be plainly seen. Every person operating or driving a motor vehicle on the public highways of this state, shall also, when approaching a cross road outside the limits of a city or incorporated village, slow down the speed of the same, and shall sound his bell, horn, or other device for signaling in such a manner as to give notice and warning of his approach."

Section 19 of the act provides, among other things:

"In approaching or passing a car of a street railway which has been stopped to allow passengers to alight or embark, the operator of every motor vehicle shall slow down and if it be necessary for the safety of the public he shall bring said vehicle to a full stop. Upon approaching a pedestrian who is upon the traveled part of any highway and not upon a sidewalk and upon approaching an intersecting highway or a curve or a corner in a highway where the operator's view is obstructed, every person operating a motor vehicle shall slow down and give a

[Patterson v. Milligan.]

timely signal with his bell, horn, or other device for sig-
naling."

And section 21 provides: "No person shall operate a
motor vehicle upon the public highways of this state
recklessly, or at a rate of speed greater than is reasona-
ble and proper, having regard to the width, traffic and
use of the highway, or so as to endanger property, or the
life or limb of any person."

The act then provides the minimum age limit for
chauffeurs, provides for licensing them, and the keeping
of a registration list of licensed chauffeurs, and prohib-
its the operation of a motor vehicle on the highways of
the state by any person as a chauffeur, unless such per-
son is licensed as required by the act.

It cannot be doubted that this statute is remedial in
its nature, enacted in the interest of public safety, and
should receive liberal construction to the end of sup-
pressing the mischief at which it is directed, and in ad-
vancing the remedy its purpose was to afford.—*Blake-
ney v. Blakeney,* 6 Port. 109, 30 Am. Dec. 574; *Sprowl v.
Lawrence,* 33 Ala. 674; *Dubose v. Dubose,* 38 Ala. 241,
30 Am. Dec. 574; *Steele v. Tutwiler,* 68 Ala. 110; *McKis-
sack v. McClendon,* 133 Ala. 560, 561, 32 South. 486;
Endlich on Interpretation of Statutes, § 107. This rule
of construction is stated by Black on Interpretation of
Law thus:

"Remedial statutes are to be liberally construed with
a view to effectuate the purpose of the Legislature; and
if there be any doubt or ambiguity, that construction
should be adopted which will best advance the remedy
provided, and help to suppress the mischief against
which it was aimed."—Black on Interpretation of Law
(Hornbook Series) pp. 307, 308.

The evil against which this statute is directed was the
negligent operation of motor vehicles on public high-

22 CA

ways, and, to the end of suppressing this evil, its design was to afford a means of identifying the owner of the vehicle by the "distinctive number" which the statute requires to be conspicuously displayed, the number being an index to the record where the name and residence of the owner may be found; and the presumption of law is that the person whose name is shown by this record is the owner of the vehicle upon which this number is displayed, and that it is operated under and by his authority. This presumption of law is, however, not a conclusive, but a disputable, one; but it carries more evidential force than a mere presumption of fact. A presumption of fact may be entirely overcome and destroyed by countervailing evidence, which authorizes the court to declare, as a matter of law, that such presumption has been overcome; but not so with a presumption of law; although, as opposed to the presumption of law, the evidence may be undisputed, yet the court will accord to this presumption the force of producing a conflict in the evidence which must be determined by the jury.—*Roman v. Lentz,* 177 Ala. 71, 58 South. 438. Speaking of the distinction between a presumption of law and one of fact, Prof. Greenleaf says:

"They [presumptions if fact] depend upon their own natural force and efficacy in generating belief or conviction in the mind, as derived from those connections which are shown by experience, irrespective of any legal relations. They differ from presumptions of law in this essential respect: That while those are reduced to fixed rules, and constitute a branch of the particular system of jurisprudence to which they belong, these merely natural presumptions are derived wholly and directly from the circumstances of the particular case by means of the common experience of mankind, without the aid or control of any rule of law whatever."—1 Greenleaf on Evidence, § 44; Jones on Evidence (2d Ed.) §§ 10, 11.

[Patterson v. Milligan.]

Taking in view the purpose of the statute to afford the evidential means of identifying the owner of such vehicle, the presumption of ownership arising from the number plate carried on the vehicle should be accorded such evidential force, under the facts of this case, as to necessitate the submission of the issues to the jury.— *Roman v. Lentz, supra.*

There is another phase of the evidence that justified the court in refusing the affirmative charge requested by the defendant. The evidence is undisputed that the automobile that struck the plaintiff carried the number 509; that the defendant Patterson on September 24, 1912, registered his car as an Olds, style 1913, factory No. 8195, 25 horse power gasoline motor, under that number and paid the fee of $12.50 therefor. The plaintiff testified on his examination in chief that after he was injured he went to the defendant's office at the place of business of the Burnett Cigar Company; that he saw there an automobile with the number 509 on it; that he had a conversation with Patterson (the defendant) with reference to the accident, in which the defendant asked him who his attorney was, and plaintiff told him that it was Mr. Denson; and that he (defendant) suggested that they go up to see the lawyer, to which plaintiff assented. Defendant then invited plaintiff into his (defendant's car), bearing the number 509, and got in with him, plaintiff thinking that they were going to see Mr. Denson; but instead of this they drove to the American Trust & Savings Bank, to the office of Mr. Anderson, attorney for the defendant, where he (as plaintiff expresses it)—"told me to talk to Mr. Anderson about the matter, and they asked me about the injuries, etc. They talked to me about the car that hit me and the man that struck me, and quizzed me in a general way. Mr. Anderson asked me about all he could think of concerning the case."

On cross-examination he testified:

"Mr. Patterson did not ask me to come over to the store. I went over there to see him. He did not necessarily take me out and show me his automobile. He asked me when we walked out if that looked like the car that struck me. I told him the best I could tell it looked pretty much like the same car. It seemed to be painted about alike; but his car, the car at that time looked like it had been more polished up. If it was the same car, it looked a little newer. I didn't tell him that it was not the same car that struck me. I didn't tell him that was not the car that struck me. I told him that the number on the car was the same; 509 was the number that struck me; and 509 was the number on the car standing there in front of the store when I went to see Patterson. I told him the one that stood there looked newer, brighter —looked brighter. I didn't say it was a newer car, but said it looked newer, brighter, cleaner. There was no distinguishing feature about it, except that I didn't see on that car that day any tag for hire, and I did see one on the car that struck me. The car that struck me had a for-hire tag on it. I didn't see any for-hire tag on Patterson's car. I did not state to Patterson in Anderson's office that the car I rode over to his office in was not the car that hit me. I swear positively that I did not state that it was not the car that hit me. You asked me if it was the same car. The best I remember, I told you if it was the same car it looked like it had been repainted, or looked brighter or cleaner. Mr. Patterson told me all the time that it was not his car that struck me, and told me all the time that he had nothing to do with the car that struck me. To explain, he told me that somebody else could have got his number and put it on that car. You said they could have done that. I did not tell Mr. Patterson on that occasion that I didn't be-

lieve that it was his car that struck me.   Mr. Patterson denied the car being his, and asked me to release the suit against him, and I told Mr. Patterson, if he could prove to me who the car belonged to, I would release the suit. I didn't want to be suing an innocent man."

This evidence, when considered in connection with the presumption arising from the fact that the car that struck plaintiff carried the number 509, and the further fact that the plaintiff's car, referred to in the testimony as an Olds, also carried this number, was sufficient to carry the case to the jury; and it was for the jury to determine, on considering all the evidence, whether or not it was the plaintiff's Oldsmobile or the Stevens-Duryea that collided with the plaintiff.

This court has stated the rule in such cases, in *Pantaze v. West,* 7 Ala. App. 607, 61 South. 44, as follows:

"It is not for the court to pass upon the conflicting, probable, or reasonable inferences to be drawn from the evidence, nor to weigh or balance one inference that could be so drawn against another contra inference deduced from other testimony, and thus determine and pass upon these different and conflicting inferences afforded by the evidence for or against one or the other of the parties to the suit, for this, under our system, is exclusively the province of the jury.   And as negligence and the failure to exercise due care and ordinary precaution, like any other fact, may be inferred from circumstances, the court would not have been justified in taking the case from the jury, unless, as a matter of law, no recovery could have been had in the case upon any view which could properly have been taken of the evidence and of the reasonable tendencies afforded by it.   The rule, as we have stated it, on this proposition, is settled beyond cavil to be the law in this state, in quite a large number of well-considered opinions."—*Smoot v. M. & M.*

*Ry. Co.*, 67 Ala. 16; *Culver, Adm'r., v. A. M. Ry. Co.*, 108 Ala. 330, 18 South. 827; *M., J. & K. C. Ry. Co. v. Bromberg,* 141 Ala. 258, 37 South. 395; *B. R. L. & P. Co. v. Enslen,* 144 Ala. 343, 39 South. 74; *McCormack v. Lowe,* 151 Ala. 313, 44 South. 47; *Haden v. Troy,* 155 Ala. 270, 46 South. 753; *W. U. Telegraph Co. v. Louisell,* 161 Ala. 231, 50 South. 87; *B. R. L. & P. Co. v. Murphy,* 2 Ala. App. 588, 56 South. 817; *B. R. L. & P. Co. v. Camp,* 2 Ala. App. 649, 57 South. 50; *So. Ry. Co. v. Noah Ellis,* 6 Ala. App. 441, 60 South. 407.

There is still another phase of the evidence that justifies the submission of the case to the jury and the refusal of the affirmative charge. In addition to the evidence above adverted to, the evidence is undisputed that at one time the Stevens-Duryea car, which, according to defendant's theory, inflicted the injury on plaintiff, belonged to the defendant and was registered by him, under the act of the Legislature quoted in the first part of this opinion, in 1912; and although there was evidence showing, or tending to show, a sale of the Stevens-Duryea by the defendant to one Douthit, before the injury complained of, yet the evidence was undisputed that such sale was not reported as required by section 8 of this statute, and this, in connection with the other evidence adverted to, justified the submission of the case to the jury.—22 Am. & Eng. Ency. Law, 1242; Jones on Evidence, § 58; *Hollingsworth v. Walker,* 98 Ala. 543, 13 South. 6.

The point most strenuously contested in the trial court was as to the identity of the automobile that inflicted the injury, and of its ownership. In order to hold the defendant liable, it was necessary for the jury to reach the conclusion either that the car that inflicted the injury was the defendant's Oldsmobile, carrying the number 509, or that the defendant owned the Stevens-

Duryea car, and, as I have shown, there was some evidence tending to support either of these conclusions. The trial court in the exercise of the functions imposed upon him, as a judicial officer, deemed it sufficient to justitfy him in submitting the case to the jury and, after the jury had found the issues in favor of the plaintiff, to warrant him in refusing the defendant's motion for a new trial.

While it must be conceded that the evidence offered by the defendant tended strongly to support the contrary view, and that the preponderance of the evidence is against the verdict, yet this is not sufficient to authorize this court to set the verdict aside. In support of this view, I quote from the decision of the Supreme Court in the case of *Cobb v. Malone,* 92 Ala. 633-635, 9 South. 739, 740 : "The power to set aside the verdict has been generally regarded in this country as inherent in courts organized upon the principles of common law, though in some states it is regulated by statute, enumerating the grounds upon which a motion for a new trial may be made. The power is essential to prevent irreparable injustice in cases where a verdict wholly wrong is the result of inadvertence, forgetfulness, or intentional or capricious disregard of the testimony, or of bias or prejudice, on the part of juries, which sometimes occurs. But, in exercising the power, the court should be careful not to infringe the right of trial by jury, and should bear in mind that it is their exclusive province to determine the credibility of witnesses, to weigh the testimony, and find the facts. Being selected for their impartiality and qualifications to judge facts, and unanimity of opinion and conclusion being required, their verdicts are presumed to be correct. It has been said that no ground of new trial is more carefully scrutinized or more rigidly limited than that the verdict is against the evidence.— Hilliard on New Trials, 339. The power should be ex-

ercised only when it affirmatively appears that the substantial ends of justice require the examination of the facts by another jury. If these be the principles by which the trial court should be governed, they apply with much more force to the exercise of the power by an appellate court. When the presiding judge refuses to grant a new trial, the presumption in favor of the correctness of the verdict is thereby strengthened. He is selected because of his legal learning, sound judgment, and the confidence of the public in his impartiality, and the courage of his convictions of right and justice. He has heard and seen the witnesses testify, observed their tone and demeanor, and noticed their candor, or convenient failure of memory, to avoid impeachment, or for other improper purpose. The appellate court, possessing none of these aids and advantages, and receiving the evidence on paper only, is less qualified to determine what evidence is unworthy of belief, or what weight should be given to that which has been rejected by the jury, and may give undue weight to the testimony of some of the witnesses. Doubtless in view of these considerations, the power to grant new trials, or to correct errors of the circuit or city court in granting or refusing to grant the same, is conferred by the statute upon this court in general terms; no rules, by which it shall be governed are prescribed, leaving the power to be exercised in accordance with well-recognized usages and rules in such cases, and in the mode in which, in the judgment of the court, the ends of justice will be best subserved. Fortunately we enjoy the experience of other appellate courts, which exercise the power to grant new trials with or without statutory authority. The rules by which the courts have been governed in the following states, respectively, are stated thus: In Arkansas: 'The rule laid down by this court, and to which we

will adhere, is that the verdict must not only be against the weight of the evidence, but so much so as, at first blush, to shock our sense of justice and right.'—*Drennan v. Brown,* 10 Ark. 138. In Tennessee: 'We adhere to and again announce the principle, as familiar from frequent repetition as it is obviously correct, that we will set aside verdicts approved by the circuit court in those cases only where the weight of the testimony against the verdict greatly preponderates.'—*Yarborough v. Abernathy,* Meigs (Tenn). 413. In Georgia: 'The court will, although with great carefulness, and only in cases of manifest and flagrant injustice, set aside a verdict when there is confessedly some evidence to sustain it.'—*Hall v. Page,* 4 Ga. 428 (48 Am. Dec. 235). In Mississippi: 'To authorize the high court to reverse a judgment for mere error in the verdict which the court below refused to disturb, the error must be clear. Every presumption is to be indulged in favor of the verdict.'— *Peck v. Thompson,* 23 Miss. 367. In Minnesota: 'But if upon a careful perusal of the testimony, and upon mature reflection, we feel satisfied that the preponderance of the evidence is manifestly and palpably in favor of the verdict, we should then deem it our duty to reverse an order granting a new trial.'—*Hicks v. Stone,* 13 Minn. 434 (Gil. 398). The foregoing extracts are made, not for the purpose of approval or adoption of the rules announced therein, but to show the caution and reluctance with which appellate courts interfere to control the discretion of the trial court in granting or refusing new trials, and to aid us, by the result of their experience, to lay down a rule salutary and conservative, and at the same time carrying into effect the purposes of the statute. * * * When there is no evidence to support the verdict, it is clearly the duty of the court to grant a new trial; no court possessed of a proper sense

of justice, and a due regard for a fair and impartial administration of the law, can afford to allow such a verdict to stand. But when there is evidence on both sides, or some evidence to support the verdict, it should not be set aside, because it may not correspond with the opinion of the court, as to the weight of the testimony, or because it is against the mere preponderance of the evidence. · Comparing the analogous rules above stated and the rules established by other appellate courts, we deduce therefrom, and lay down as rules for the guidance of this court, that the decision of the trial court, refusing to grant a new trial on the ground of the insufficiency of the evidence, or that the verdict is contrary to the evidence, will not be reversed, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it is wrong and unjust."—*Cobb v. Malone,* 92 Ala. 633, 9 South. 739.

In the case of *Yolande Coal & Coke Co. v. Norwood,* this court, speaking by DE GRAFFENRIED, J., said: "The tenacity with which the Anglo-Saxon race has clung, through successive ages, to the system of trial by jury indicates that through that system the English-speaking people believe that justice, under the law, is usually attained. As the jury is the forum to which the law has committed the determination of questions arising out of disputed facts, and as the trial judge himself is present during the trial and has the opportunity of hearing the witnesses when they testify and of observing their demeanor upon the stand, it is but right that an appellate court, when there is some evidence to support the verdict, should not disturb the action of the trial court in refusing to grant a new trial, upon the ground that it was contrary to the evidence, or that the verdict was excessive, unless the preponderance of the evidence against

[Louisville & Nashville R. R. Co. v. Jones.]

the verdict is so strong that the appellate court can say that it was palpably wrong and unjust."—*Yolande Coal & Coke Co. v. Norwood,* 4 Ala. App. 397, 58 South. 121.

After a careful consideration of the evidence in the record, and after allowing all reasonable presumption in favor of the ruling of the trial court and the correctness of the verdict, I am not able to say that the preponderance of the evidence is so decided as to clearly convince me that the verdict is wrong and unjust.—*Montgomery-Moore Mfg. Co. v. Leeth,* 2 Ala. App. 324, 56 South. 770; *Borden & Co. v. Vinegar Bend Lumber Co.,* 2 Ala. App. 354, 56 South. 775; *M. & O. R. R. Co. v. Barber,* 2 Ala. App. 509, 56 South. 858.