**MASON v. AUTOMOBILE FINANCE CO., Inc.**

**Inc.**

**No. 7567.**

United States Court of Appeals for the
District of Columbia.

Decided March 17, 1941.

Joseph C. Turco and Irving B. Yochelson, both of Washington, D. C., for appellant.

Norman B. Frost and Frank H. Myers, both of Washington, D. C., for appellee.

Before GRONER, Chief Justice, and VINSON and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The appeal is from a judgment for defendant entered upon a directed verdict. The suit was for damages for personal injuries resulting from an automobile collision. The only error assigned is the court's direction of the verdict. The only issue here is whether the evidence was sufficient to require submission to the jury on the question whether the car which caused plaintiff's injuries was owned or controlled by defendant when the collision occurred on August 4, 1937. The facts are not substantially in dispute. But the parties differ concerning the inferences which may be made from them.

Clarence Worthy originally owned the car. He obtained a loan upon it from defendant, secured by a chattel mortgage. He also deposited with defendant the unassigned certificate of title issued in his name. His instalment payments became several months in arrears. He allowed the license registration to lapse. He permitted the mechanical condition of the car to become such that it could not pass inspection. In these circumstances he stored the car in Walker's Garage. For several months at least it was not in use, the payments were delinquent, and until shortly before the collision defendant was not able to find either Worthy or the car, although it made efforts to locate both.

The driver of the car at the time of the collision was Clinton Whitley. About a month before the accident he went to defendant's office "to see about taking over the notes on this car." The record does not show whether this visit or the negotiations which followed it were instigated originally by Worthy or by the defendant. Apparently they were not at Worthy's instance, because Whitley testified that he returned to defendant's office two or three times a week expecting "to meet this Clarence there, but he never did show up any time I went there to talk over this car." However, defendant's manager, Olmer, testified that he had a conversation with Worthy about his payments three weeks or a month before the accident, that Whitley came in

later and "then they came in again later on," apparently together on the last occasion. Olmer testified that on Whitley's first visit he "wanted to take over that automobile, provided that it could be inspected, that is, placed in shape to be inspected and secure a certificate of title. In other words, it would have to pass inspection. He was going to take over and assume Worthy's obligation." He also testified that when Worthy and Whitley came in together "the arrangement was made between the three, that that was to be done." This testimony is substantially in accord with Whitley's statement that he finally met up with Worthy and took him to defendant's office, where they agreed to the arrangement set forth in Olmer's testimony. As to the nature of that arrangement, Whitley testified: "I had arranged to take the car over and put it in running condition, and would pay the notes. If he would put it in running condition, I would pay for it * * * I was not buying it. I was going to take over the notes he owed on the car." He also stated that in one of the conversations with an official of defendant, apparently Olmer, the latter said, " 'You have to get Worthy up here with you * * * so that you can come to some agreement,' because [I] was going to take the car if Worthy did not pay his notes."

Pursuant to the oral understanding, Whitley paid $130 for a new motor, the application for which apparently was made in Worthy's name. Whitley also purchased a new battery. Other parts were needed, and on the day of the collision Whitley went to defendant's office, where it was arranged that Melancz, described as defendant's "outside contact man," should accompany him to Walker's Garage and assist in getting the car ready for inspection. Melancz suggested to Whitley that he follow him to a junk yard where he could purchase the additional parts needed more cheaply than elsewhere. He also supplied dealer's license plates, which were held by defendant, and were attached to the car at the garage by Melancz and Whitley. Then, Melancz, driving his own car, with Whitley following in the car in question, led the way toward the junk yard. It was while they were driving to the yard that the collision took place. It was understood that, after the inspection was completed, Melancz and Whitley would return to defendant's office, where Worthy was to assign the title formally to Whitley and the latter was to as-

sume responsibility for the payments in arrears. Because of the collision, this part of the plan never was carried out.

Immediately after the accident Melancz gave Whitley the registration card with the statement, "You have it when the officers come." When the officers arrived they took Whitley to the precinct station and placed charges of reckless driving against him. Melancz accompanied him to the station and told him "it would be all right, that his company would get a lawyer and get me out." The inspection never was had and the defendant removed the damaged car to the parking lot where it regularly stored cars in its possession. The towing was done at Melancz' instruction and with a machine owned by defendant. Defendant paid for the storage after the accident in accordance with its working agreement with the owner of the garage. Later defendant gave Worthy "a regular 10 days notice" and sold the car "about a month or so" after the accident. Although defendant raises some question concerning Melancz' authority in relation to some of the acts done by him, Olmer testified that Melancz collected all accounts and made adjustments, and that he instructed Melancz "to go ahead and take the car and handle that account."

Plaintiff advances various contentions, including the so-called Massachusetts doctrine that one who permits another to use on an unregistered vehicle license plates issued to him becomes liable for injuries which result from its operation on the highways.[1] Her principal insistence, however, is that the jury should have been allowed to consider the evidence and determine whether defendant had become the owner of the car by repossessing it prior to the collision so as to impose upon it liability for its negligent operation by another with its consent.[2] She also says that irrespective of owner-

ship defendant then was in control of the car and using it about its own business. On the other hand, defendant says that the evidence established only that it was rendering assistance to Worthy and Whitley in consummating their agreement and that it was not sufficient to show or permit the inference that defendant had repossessed the car or otherwise acquired ownership or control of it prior to the collision.

We think the evidence should have been submitted to the jury. In our judgment it was sufficient to permit conflicting inferences to be drawn[3] concerning whether repossession had occurred and defendant had become the owner of the car prior to the collision for purposes of liability under the Automobile Financial Responsibility Act. [D.C.Code, 1929 (Supp.V) tit. 6, § 255b.] The statute provides: "Whenever any motor vehicle * * * shall be operated upon the public highways of the District of Columbia by any person other than the owner, with the consent of the owner, express or implied, the operator thereof shall, in case of accident, be deemed to be the agent of the owner of such motor vehicle, and the proof of the ownership of said motor vehicle shall be prima facie evidence that such person operated said motor vehicle with the consent of the owner." 49 Stat. 167.

■ There is no question that defendant consented to Whitley's driving the car. The only issue is whether it did so as owner. "Owner" and "ownership" for purposes of the Act are not defined. Their meaning is left for judicial determination and this should be made so as to give effect to the objects and purposes of the statute. The question here is whether a chattel mortgagee, situated as defendant was, or the mortgagor, Worthy, should be considered the owner for enforcing the statutory liability.

---

[1] McDonald v. Dundon, 1922, 242 Mass. 229, 136 N.E. 264, 26 A.L.R. 1243; cf. Haring v. Connell, 1914, 244 Pa. 439, 90 A. 910. But see Armstrong v. Sellers, 1913, 182 Ala. 582, 62 So. 28; Hyde v. McCreery, 1911, 145 App.Div. 729, 130 N.Y.S. 269; Black v. Moree, 1916, 135 Tenn. 73, 185 S.W. 682, L.R.A.1916E, 1216; Mumme v. Sutherland, Tex.Civ. App.1917, 198 S.W. 395. Contra: Armstead v. Lounsberry, 1915, 129 Minn. 34, 151 N.W. 542, L.R.A.1915D, 628.

[2] Under the Automobile Financial Responsibility Act, pertinent parts of which are set forth in the text below.

[3] Cf. Callas v. Independent Taxi Owners' Ass'n, 1933, 62 App.D.C. 212, 66 F. 2d 192; Simmons v. Brooks, 1934, 63 App.D.C. 293, 72 F.2d 86; Jones v. Detroit Taxicab & Transfer Co., 1922, 218 Mich. 673, 188 N.W. 394; Hatter v. Dodge Bros., 1918, 202 Mich. 97, 167 N. W. 935; Nemzer v. Newkirk Ave. Automobile Co., 1915, 91 Misc. 13, 154 N.Y. S. 117; Patterson v. Millican, 1914, 12 Ala.App. 324, 66 So. 914; Bogorad v. Dix, 1917, 176 App.Div. 774, 162 N.Y.S. 992; Ford v. Hankins, 1923, 209 Ala. 202, 96 So. 349; Doyon v. Massoline Motor Car Co., 1923, 98 N.J.L. 540, 120 A. 204.

One who is no more than a chattel mortgagee is not such an owner.[4] Nor does he become such merely by virtue of a default by the mortgagor.[5] That is true though the right to possession may accrue immediately upon default. Something more than a lien on the property, though presently and summarily enforceable, is necessary. In the absence of some definite statutory criterion of ownership, we think the purpose of the statute was to place the liability upon the person in a position immediately to allow or prevent the use of the vehicle and to do so by giving a lawful and effective consent or prohibition to its operation by others. The object was to control the giving of consent to irresponsible drivers by the one having that power rather than to impose liability upon one having a naked legal title with no immediate right of control.

It is not conclusive, therefore, against defendant's ownership for the statutory purpose that title to the car was registered at the moment of the collision in Worthy's name.[6] Though that was true, if the car then was rightfully in defendant's possession and its possession was such that it had the power and the legal right to permit its use by another, it became the owner within the meaning of the statute. Whether it had such possession depends, we think, upon the intention which characterized the acts done by Olmer and Melancz on the day of the collision.

The acts were in themselves equivocal, but they were sufficient to constitute a taking of possession by the defendant if accompanied by an intention to do so. On the one hand, they were susceptible of the inference that they were done with the purpose on the part of the defendant merely to render friendly assistance to Worthy and Whitley in completing a transaction which concerned them primarily and defendant only in an incidental manner relating to the preservation of its security. On the other hand, they were also susceptible of an inference that in performing them defendant intended to take immediate control of the car as against Worthy, and this was true though it may have been intended also that the car later should be transferred to Whitley when the inspection and formalities of transferring title to him had been completed.

Defendant regards the latter inference as not permissible from the evidence because it discloses that prior to the acts in question Worthy and Whitley had agreed that the car should be transferred to the latter and he should assume the former's overdue instalments. It regards the agreement as having been a contract of purchase and sale between Worthy and Whitley, with itself as an independent third party standing only in the position of a chattel mortgagee consenting to the transfer between the vendor and the vendee. As against this view, the circumstances surrounding the making of the oral agreement, as well as those which took place on the day of the collision, would sustain an inference that the defendant's part, both in bringing about the arrangement and in attempting to carry it out, was that of an active promoter and party to it and, in fact, the party having the whip hand concerning it. As sustaining such an inference the following facts may be cited: Worthy had been long in default, had allowed the license registration to lapse, had not used the car for several months, and apparently had no intention of resuming its use or of completing the payments. Defendant had made efforts unsuccessfully to locate both him and the car. The attempt to find the car, as distinguished from Worthy himself, could have been consistent only with a purpose to repossess it. Furthermore, the evidence is at least susceptible of the inference that the defendant, rather than Worthy, first made contact with

[4] Lennon v. L. A. W. Acceptance Corp., 1927, 48 R.I. 363, 138 A. 215; cf. Coonse v. Bechold, 1919, 71 Ind.App. 663, 125 N.E. 416.

[5] The authorities relied upon by plaintiff as supporting the contrary view do not involve a question of ownership for purposes of liability under a statute like that involved here, but hold only that upon default the mortgagee of a chattel may retake it without notice to or knowledge of the mortgagor, subject only to restrictions set out in the mortgage, asserting that the mortgagee becomes "the absolute owner" of the property for purposes of repossession. See Lange v. Midwest Motor Sec. Co., Mo.App.1921, 231 S.W. 272; Goodman v. Schulman, 1932, 144 Misc. 512, 258 N.Y.S. 681.

[6] Rosenberg v. Murray, 1940, 73 App. D.C. —, 116 F.2d 552; cf. St. Joseph v. Grantham Motor Sales, 1934, 269 Mich. 260, 257 N.W. 701, holding that a mortgagee who had repossessed the car from a mortgagor in default was the owner and chargeable with liability under an act similar to that involved here.

Whitley, that it was the active agent in inducing him to take over the car and assume the payments, and that it induced him to locate Worthy and bring him to the defendant's office for the conference at which the understanding was reached. Whitley's testimony bears out such an inference in his statement, "I was not buying it. I was going to take over the notes he owed on the car." He also said, as pointed out above, "I was going to take the car if Worthy did not pay his notes." The latter statement, if believed, might indicate that the defendant intended to transfer the car to Whitley regardless of Worthy's consent. Although Olmer testified that he regarded the transaction as one of purchase and sale between Worthy and Whitley, the latter's testimony is consistent with the view that his dealings were primarily with the defendant, that the defendant for all substantial purposes was the vendor, and that Whitley's part in the transaction was merely to complete the formal assignment of the legal title, as an alternative to the formalities of defendant's acquiring it through repossession.

The defendant also was the active party in carrying out the arrangement. Worthy did not assist in completing the transaction other than by agreeing to come to the defendant's office after the inspection in order to sign the certificate of title. It does not appear that he gave Walker's Garage instructions to turn the car over to Whitley or to the defendant, although there is nothing to show that he prohibited the garage from doing so. He did not undertake to assist in getting the car ready for inspection, either by making repairs or by transporting it to the place of inspection. His part was an entirely passive one and therefore consistent with the idea that he considered himself and the others considered him to be only formally interested. On the other hand, the defendant's authorized agent took physical custody of the car from the garage, both by attaching defendant's dealer's license plates to it, thus making it possible for the car to be driven on the streets, and by assuming control of its movements. It could not be inferred from these facts that Whitley was in possession of the car. The only possible inferences are that Worthy remained in possession with the defendant performing these acts with his consent, or that in performing them defendant intended to and did assume possession of the car pursuant to its rights under the mortgage. These facts, together with those which occurred following the accident, are clearly consistent with an intention on the defendant's part not to return the car to Worthy or permit it to be returned to his custody in any event, whether the formal transfer of title between him and Whitley should be completed or not.

■ Over the defendant's objection the court admitted evidence concerning acts, particularly of Melancz, which took place following the collision. We think this evidence was properly admitted as showing the intention with which Melancz was acting, not only at the moment they occurred, but from the time shortly before when he attached the license plates to the car and aided in removing it from the garage. Melancz not only aided Whitley with reference to the criminal charge lodged against him but also, and even more significantly, had the car removed with the defendant's truck to the defendant's usual storing place. Later the defendant paid the storage charges on the car and eventually sold it, although this occurred after it had gone through the motions of giving notice to Worthy and completing the formalities of repossession. Notwithstanding the completion of the formalities a considerable time after the collision, we think that the acts of Melancz immediately following the collision show that it was clearly the intention of the defendant not to permit Worthy to resume possession of the car and that they are so closely connected in time and circumstance with Melancz' acts preceding the collision that they throw light upon the intention with which these were done, at any rate sufficiently that the jury might have inferred that Melancz' acts previous to the collision were done with an intention then and there to take possession of the car.

■ In view of what has been said, it is not necessary to pass upon the other contentions which were advanced by the defendant. We think, however, that what has been said concerning the sufficiency of the evidence to support an inference of ownership by the defendant equally sustains the view that the jury should have been allowed to infer from it that at the time of the collision the defendant was in control of the car and was exercising that control for the purpose of carrying on its own business. It could have been found that defendant's primary object in all that it did was not merely to render a friendly service to Worthy and Whitley, but was to procure from Whitley, if not from Worthy, payment of overdue instalments and the unpaid

balance of its mortgage. Whether or not Melancz' acts constituted a taking of possession in the technical sense, the jury could have found that they amounted to an assumption of control of the car by the defendant and a use of it in furthering its own business purposes as stated above.

In accordance with the controlling principle which we have said governs the construction of the term "owner" in the Automobile Financial Responsibility Act, we think the jury might readily have inferred that at no time after Melancz went to Walker's Garage could Worthy, in view of his position of default and perhaps of abandonment of the car, have taken the control of it from Melancz and given effective permission to someone other than Whitley to remove the car or drive it on the streets. In brief, the jury might have found that Melancz, and through him the defendant, had control as well as possession of the car rightfully and to the exclusion of control or possession by Worthy.

It follows that the judgment must be reversed and the cause remanded to the District Court with instructions to grant a new trial.

Reversed and remanded.